## CARR et v
## TRUSTEES OF LANE SEMINARY et

Ohio Common Pleas, Hamilton Co

Decided May 23, 1935

C. R. Heberling, Dayton, and Jerome T. Miller, Dayton, for plaintiffs.

John Weld Peck, Cincinnati, and John Colville Taylor, Cincinnati, for defendants.

## OPINION

### By MACK, J.

By way of preface to a consideration of the issues involved in this cause and the conclusions reached thereon by the court the following statement of conceded or undisputed facts is deemed essential.

"The Lane Seminary" was incorporated by Act of the Legislature of Ohio passed February 11, 1829, whereby it was enacted "that there be, and hereby is established in the county of Hamilton, a theological institution for the education of pious young men for the Gospel Ministry, by the name of 'The Lane Seminary'." After conferring the necessary powers for such a corporation it was:

"Provided, that the funds, property and revenues of the same shall not be appropriated, employed or expended for any purpose other than that contemplated by this act."

In section 3 of the act it was provided that the officers and members of the executive committee shall reside in Cincinnati, or its vicinity, a majority of whom "together with all the professors, tutors, teachers and instructors in said institution, shall be members of the Presbyterian Church, in good standing, and under the care of the General Assembly of that church, in the United States."

In December, 1829, "feeling a deep interest in the success of said institution, and being desirous of promoting its benevolent objects in the increase and diffusion of knowledge and religion as tending to advance the valuable interest of their fellowmen," Thomas Kemper and others conveyed to the trustees of The Lane Seminary, and their successors forever, sixty acres of land on Walnut Hills, then near the City of Cincinnati, in Hamilton County, Ohio, the deed containing a reversion to The American Bible Society, American Tract Society, The American Colonization Society and The American Educational Society, "and in case any of them shall become extinct then the property, or a due portion of it, is to be appropriated to such religious institutions as the General Assembly of the Presbyterian Church of the United States of America shall in their wisdom direct, in case the said Lane Seminary shall ever fail or become extinct."

Among those deeply interested in said institution was Preserved Smith of Dayton, Ohio, who from a time prior to 1871 and down to the time of his death on January 18, 1887, continuously was a trustee thereof, his son being educated at said Seminary in 1871 and prior thereto.

Such institution was a prosperous one having the necessary buildings, library, and other equipment, and a roster of quite a large number of students. Indeed in Howe's Historical History of Ohio, a publication of the State of Ohio, as well as many histories of Cincinnati and Hamilton County, Lane Seminary was always mentioned as a leading educational institution of this vicinity

Accordingly, on March 29, 1871, said Preserved Smith in an instrument showing that it evidently was prepared by one versed in the law, reciting that he "earnestly desiring that the gospel of Our Lord and Saviour Jesus Christ may be made known to all mankind, and that all may enjoy its inestimable blessings," made to the trustees of said Seminary a donation of certain twelve (12) first mortgage bonds for one thousand dollars each, payable June 1, 1896, and having attached thereto certain specified coupons, and said bonds being numbered as stated in the instrument. Such instrument provided:

"The fund shall be known as 'The Preserved Smith Scholarship Fund.' The principal shall be kept inviolate and the interest shall be collected and applied to the education of christian young men for the christian ministry, and to no other purpose, except as hereinafter provided."

It reserved the right of donor and his heirs to select one or more young men annually who shall have the benefit of the scholarships thereby agreed to, and such as may not be selected by donor or his heirs to be selected by the board of trustees of the seminary.

Article V of said instrument provided:

"Should the interest, occurring from this fund be, at any time applied to any other purpose than that indicated in this instrument, the whole of said fund, or said Twelve Thousand Dollars, and the unexpended interest, shall be forfeited and revert to me or my heirs. And I declare that the loaning of said interest or any part of it or appropriating it, temporarily to other uses shall be such a misapplica-

tion of the fund, as works a forfeiture of the same, with the interest, that may be at the time unexpended."

Such instrument gave the donor, his heirs, etc., free access to the books of the institution at all times, to examine the same and see that the funds are properly taken care of and the interest properly applied. It provided that at the maturity of the bonds the trustees shall collect the principal and in their best judgment reinvest the same, etc.

Article VIII of the instrument provided:

"Should Lane Seminary ever cease to exist, or cease to be a Protestant Evangelical Theological Seminary, the said fund and all the interest that may be unexpended at the time, shall become forfeited and revert to me or my heirs."

On said day the board of trustees duly accepted said gift on the terms and conditions therein specified.

Thereafter, by his Last Will and Testament executed February 14, 1884, which likewise shows on its face that it evidently was prepared by one also versed in the law, under Item XVI thereof he bequeathed to the trustees of Lane Seminary Fifteen Thousand Dollars in securities "to be added to The Preserved Smith Scholarship of said seminary, the interest of which is to be applied to the education of christian men for the christian ministry." Said item also bequeathed Ten Thousand Dollars in securities "as a library fund to be known as 'The Preserved Smith Library Fund of said seminary, the interest of Ten Thousand Dollars to be used for library purposes of said seminary."

It was provided in said Item XVI that said sums aforesaid are bequeathed upon certain express conditions, the essential ones of which are as follows:

"That said Lane Seminary shall continue to be a Protestant Evangelical Theological Seminary. * * * That neither of said sums or any part of either of them or the interest thereon, or any part thereof, shall be at any time applied to, or in any way used no difference for how short a time for any other purpose than that for which it is hereby specifically bequeathed. * * * That the principal of said sum shall be held inviolate, the interest thereof only to be used for the purposes aforesaid."

Power is given to the trustees to reinvest the securities when they become due

"so that the interest may be continuously and perpetually applied as aforesaid." It is added that if the interest for any six months together is not needed "then such interest shall be invested, and that its produce applied when needed, as other interest is hereby required to be applied."

Power is given to the heirs of testator to examine the books of the seminary to ascertain how the bequests were being used and applied. It is also provided "that any violation or failure of any or either of these conditions, shall work a forfeiture of all the sums in this item named, and in such case, said sums with all interest that may be unexpended at the time of said forfeiture, shall revert to my heirs at law."

After the death of Preserved Smith one of his sons became a member of the board of trustees of the institution and continued as such for many years taking an active part in the conduct of its affairs.

Some years prior to 1931 the seminary was having a hard struggle for existence. Efforts were made with only a small degree of success to raise the necessary funds for its conduct. The number of its students dwindled to about twelve to eighteen a year. None of the students were self-supporting. So the General Assembly of the Presbyterian Church in the United States of America wisely took the view that there were too many Presbyterian Theological institutions; that the standards of theology and education for these days had been raised and that a larger faculty was necessary for a capable system of theological education. And so in view of this the action of the trustees of Lane Seminary hereinafter mentioned, looking to the education of its students at Chicago and the removal of its library for such purpose to that place, was taken.

On March 22, 1930, the trustees of Lane Seminary filed a petition in the Common Pleas Court, Hamilton County, against the General Assembly of the Presbyterian Church in the United States of America, and others, reciting the conveyance of real estate from the Kempers in 1829 with the reversionary provision hereinbefore mentioned; reciting that it had become impracticable to carry out in the most efficacious manner at the location for which said real estate was conveyed the purposes of the institution; reciting that on account of far reaching economic and social changes in recent years it has been difficult to obtain a proper number of students to attend at Lane Seminary; reciting a large increase in the number of theological institutions since the establishment of Lane Seminary

in 1829; reciting the reduction in the number of enlistments of young men for the Gospel Ministry; reciting that only approximately four hundred and sixty students had enrolled in all Presbyterian Theological Colleges during the year 1927-28, and that of its number about seventy-five per cent were enrolled in three institutions, leaving the remaining one hundred and fifteen students enrolled in the seven smaller seminaries.

Such petition recited the unsuccessful efforts at raising funds for Lane Seminary in order to carry on its work successfully; and that the development of educational progress called for an elaboration of curricula in theological institutions which required equipment and a teaching staff which can only be provided from large incomes or generous gifts. Said petition recited that the purposes of Lane Seminary could best be carried out by the employment of its resources at and in conjunction with the Presbyterian Theological Seminary, Chicago, at Chicago, Illinois, which was willing to merge or combine with Lane Seminary so as to permit the continuance of Lane Seminary as an actual and legal entity, to administer its funds and assets at Chicago for the purposes for which the same were held by Lane Seminary. Such petition recited it was proposed to maintain Lane Seminary as a legal entity to be known as 'Lane Seminary Foundation', and it asked permission to sell or lease its physical assets for said purpose.

In the Common Pleas Court it was decreed that the court was without jurisdiction to grant the trustees permission to carry out the plan set forth in the petition, or to abandon the conduct of the theological institution in Hamilton County.

Thereafter the cause was appealed to the Court of Appeals and in that court a supplemental petition was filed on March 2, 1932, reciting that the trustees of Lane Seminary had become the owners of the remainder or reversionary interests of the institutions mentioned in the deed from the Kempers. Thereupon, on March 2, 1932, that court decreed:

"That the plaintiffs in the administration of their trust have the right to carry on their educational work by the establishment of endowments, scholarships and fellowships, together with the use of their library and library funds at Presbyterian Theological Seminary of Chicago, Illinois, and to devote their trust fund thereto, and to sell or lease the lands, buildings, and other assets, real and personal, now owned or held by Lane Seminary or by plaintiffs as trustees thereof, or such part thereof as said trustees may deem proper, and to hold, conserve, use and administer the proceeds, as well as their other funds, for the purpose of so carrying on their educational work in conjunction with said Presbyterian Theological Seminary at Chicago, Illinois, and to that end to establish a fund designated as 'The Lane Seminary Foundation,' or by such other designation as said trustees may select, and to take all measures and steps necessary or convenient to the objects aforesaid."

To said action of the Common Pleas Court the attorney general of Ohio was made a party defendant, with leave to plead, but filed no answer in said cause.

* * *

Instant action was filed July 19, 1934, by Fannie Smith Carr, a surviving daughter of said Preserved Smith, and Winifred Smith and Preserved Smith, sole heirs at law of Henry Preserved Smith, deceased, who was a son of said Preserved Smith.

In a lengthy petition to which is attached copies of the original trust donation and will of said Preserved Smith, and a copy of the articles of incorporation of The Lane Seminary, it is alleged, (stating the allegations concisely), that plaintiffs and defendants Mrs. Ulrick Phillips, Annabelle Mayo Smith and Richmond Mayo Smith are the heirs at law of Richmond Mayo Smith, a deceased son of said Preserved Smith, and that in addition to said three children of Preserved Smith hereinbefore mentioned, one died in infancy and another child, Walter Smith, died leaving no issue. The action is brought against the trustees of The Lane Seminary, a corporation, the individual trustees, said other heirs of Preserved Smith and the attorney general of Ohio.

For causes of action it is alleged that the trustees have applied and threatened to apply "The Preserved Smith Trust Fund" and income to purposes other than agreed upon with the donor; that Lane Seminary has ceased to exist, and has ceased to be a Protestant Evangelical Theological Seminary; that the trustees have failed to keep the trust fund inviolate and threaten to use the same contrary to the trust agreement; that on account of the action taken in said cause in the Common Pleas Court the trust funds have reverted to plaintiffs and the other heirs of Preserved Smith.

In a second cause of action similar allegations are made with reference to the bequests under the will of Preserved Smith,

and it is prayed that the trustees furnish satisfactory proof that the trust funds are held inviolate and within the jurisdiction of this court in conformity to the agreement with Preserved Smith; that the court find that there has been a breach of trust and forfeiture entitling plaintiffs and the heirs to receive the property, for an accounting and for a receiver.

On behalf of the attorney general of Ohio an answer is filed asking that the court preserve and enforce the trust for charitable and educational purposes and restrain an abuse thereof.

On behalf of the trustees of Lane Seminary there is a denial of any violation of the terms of the trusts; a denial that Lane Seminary had ceased to exist or ceased to be a Protestant Evangelical Theological Seminary; a denial of any right of the plaintiffs, or other heirs of Preserved Smith to the trust funds; a denial that defendants have failed to keep the trust funds inviolate. The proceedings in the Common Pleas Court and the decree in the Court of Appeals are set forth and it is stated that defendants propose to use the trust fund for educating young men for the christian ministry by the establishment of proper endowments, scholarships and fellowships, and by carrying on the work of education by and through the instrumentalities of The Presbyterian Theological Seminary at Chicago, Illinois, a similar institution devoted to the same identical purpose as that of Lane Seminary.

Similar allegations are made with reference to the second cause of action set out in the petition, there being a general denial of the violation of any of the terms of the trust agreement or will entitling plaintiffs or any of the heirs of Preserved Smith to any part of the trust property.

By way of cross-petition defendants say that plaintiffs have embarrassed the trustees in their administration of the trust funds and they pray for an injunction against further claims, demands or threats of plaintiffs with relation to the matters involved herein.

By amended answer defendants plead acquiescence in the management, investment and bookkeeping entries relating to the trusts and say that the instances now complained of took place from twenty to forty years ago and in that interim witnesses have died and documents have become obscure of meaning and no longer susceptible of explanation by reason thereof, and that the trustees have continued to act in the manner in which they have acted on account of and in reliance on the acquiescence of plaintiffs and their ancestors. Said amendment concludes "by reason of such facts and circumstances plaintiffs are estopped to complain of instances of alleged mismanagement which occurred more than six years prior to the filing of instant action."

By way of reply plaintiffs deny that they were parties to or are bound by what was decreed by the Court of Appeals. It is further alleged that defendants failed to keep the accounts of the trust funds in such a manner as to enable plaintiffs to ascertain the correct status thereof. In an additional reply plaintiffs deny the allegations as to laches or their knowledge of any acts or violations by defendants until shortly before the bringing of instant action.

Before proceeding to a consideration of the evidence it should be stated that plaintiffs' attorneys, not only before the trial of this cause, but constantly during such trial, were afforded every opportunity and all possible assistance to have the fullest access to every book, document and paper constituting the records that remain in the possession of defendant corporation after over one hundred years of existence. The character of the institution and the fact that plaintiffs are the descendants of one who was a liberal benefactor justly called for this aside from the rule of law which insists that a trustee should at all times make the fullest accounting and disclosure. In addition to numerous books, some seven large cases of such records were brought to the court and free access thereto afforded plaintiffs, their attorneys and accountant. Many of such records were made by trustees, officers or others, none of whom now survive to explain the circumstances attending their making.

Likewise, it may be well to consider several propositions which were suggested or urged in the argument of this case, and as to which the court entertains a different view.

(a) As to the extent and effect of the litigation commenced in the Common Pleas Court as case No. A-19354, and heard by the Court of Appeals under case No. 3966 on the docket of said court, part of the decree wherein is above set forth, obviously that litigation and the decree is in no sense binding upon the plaintiffs in instant case, because neither they nor any one representing them were parties to such litigation. Nor is such litigation and decree in any sense res adjudicata as to the state of Ohio represented by its attorney general. That litigation and the decree must be confined to the power of disposition of the

trustees of Lane Seminary over the real estate which was deeded to them by the Kempers under the terms and conditions relating thereto and hereinabove referred to.

(b) It is suggested that §8623-68, GC, is applicable to a proposed consolidation or merger of Lane Seminary with the Chicago Theological Institution. As to this, the court is in complete disagreement with such contention. That section is found under Part Second, Title IX, Division I, Chapter 1, of the statutes, whereas religious, educational and benevolent corporations, with their powers, etc,. are treated under Division VI of said Part 2, Title IX, of the statutes. Moreover, if applicable, said §8623-68, GC, in the opinion of the court, extinguishes the existence of the consolidated or merged corporations, and vests their real and personal property in the consolidated corporation, subject to the respective debts and liabilities of such constituent corporations.

(c) Likewise, the court is unable to agree with the argument that §10038, GC, relating to the consolidation of charitable, benevolent or educational institutions, preserves the corporate existence of the merged or consolidated institutions. Said provision expressly provides for a corporate name, which may be that of either one of the merged institutions or a new name. And the effect of such consolidation, likewise, is to vest in the consolidated corporation the properties of the separate corporations, subject to the terms and conditions on which the separate corporations hold such property.

If therefore the Chicago Theological Institution were to become merged into the Lane Seminary Ohio corporation, then in the opinion of the court, the Ohio Lane Seminary Corporation would continue its existence, but if Lane Seminary were merged into the Chicago Theological Institution, or under a new corporate existence, then, in the opinion of the court, Lane Seminary would cease to exist as an Ohio corporation. Cases cited from Illinois and other states do not bear out the contention urged, because an examination of them shows that under the statutes of some other states it is expressly provided that the agreement of consolidation may provide for the continued existence of the separate merging corporations.

Moreover, the general rule, as expressed by the decisions of courts and text writers, is that in the absence of an express provision continuing the corporate existence of merged or consolidated institutions, a

merger or consolidation extinguishes the separate legal entity. of the merged or consolidated corporations. 6 American and English Encyclopedia of Law, 810; 10 Cyc., 302; 10 Ohio Jurisprudence, p. 127, §62.

As a simile it is said in the brief for defendants that "the conflux of the Monongahela and Allegheny to form the Ohio does not extinguish either of them, but merges them into a grander and larger entity." We cannot agree with this. There is no longer a Monongahela River nor Allegheny River. These rivers ceased at the point of conjunction, just as the Ohio River ceases upon its waters emptying into the Mississippi.

But it is unnecessary to resort to textbooks or decisions of courts outside of Ohio. There is a wealth of expressions by our Supreme Court on the question.

In State of Ohio ex Sherman et, 22 Oh St, 411, at 428, the court said, per Welch, J.:

"The real transaction in all such cases of transfer, sale or conveyance, in legal effect, is nothing more nor less, and nothing other, than a surrender or abandonment of the old charter by the incorporators, and the grant de novo of a similar charter to the so-called transferees or purchasers."

In Shields v State, 26 Oh St 86, at 92, the same judge said:

"Are the old companies dissolved, and their charters extinguished, and is the consolidated company a new corporation, receiving all its rights and powers directly from the legislature? In the light of the decision of this court in the State of Ohio v Sherman et al, we do not see how an affirmative answer to these questions can be avoided."

In Compton v Railway Co., 45 Oh St, 592, at 615, Minshall, J., said:

"Nor can there be much question but that by consolidation the prior companies are extinguished for all purposes except to preserve the rights of their creditors, for which purpose they 'may,' in the language of the law, 'be deemed to be in existence'."

In Ashley et v Ryan, 49 Oh St, 504, the same judge said at page 529:

"The result is that by consolidation, whether between Ohio companies or between an Ohio company and companies of another state, a new company is formed by the extinguishment of the old ones. And it has been so determined in a number of cases.

In **Trust Co. v Traction Co., 106 Oh St, 577,** it is stated as Syllabus 9:

"Upon consolidation of several railroads under authority and in accordance with the provisions of Ohio statutes, the nominal existence of the several constituent companies is terminated, but their substantial existence is perpetuated by being merged in a consolidated company."

In **Marfield v Traction Co., 111 Oh St, 139,** the court in an opinion per Marshall, C.J., discussed the terms "consolidation" and "merger," and reached the conclusion that a consolidation is a merger and that its effect is to merge the old corporations into a new one, which takes their place, succeeds to their property and assumes their liabilities.

* * *

Coming now to a consideration of the evidence and the merit of the claim made by plaintiffs in behalf of the forfeiture of the funds established by the instrument executed by Preserved Smith in his lifetime and by his last will and testament, it is well to bear in mind the following:

Chief Justice John Marshall in the famed Dartmouth College case, with his supreme ability to express legal doctrines in concise language, reminded us more than one hundred years ago that "the will of a donor becomes the law of donation," and that a court should seek to "perpetuate the bounty of the donor and the specified objects of that bounty." Lord Coke, in Coke on Littleton, 283 B, says:

"The law of England respecteth the effect and substance of the matter and not every nicety of form or circumstance."

Long honored in the law has been the maxim "Qui haerit in litera haeret in cortice," which expressed in the vernacular is "he who considers merely the letter of an instrument goes but skin deep into its meaning."

With these polar stars before us, let us ascertain, if possible, the clearly expressed intention of Preserved Smith in the creation of the trusts in question, having in view all of the surrounding circumstances. He was an officer and deeply interested in a theological institution for the education of pious young men for the gospel ministry. Such institution was to be one in which the officers, members of the executive committee and all professors, tutors, teachers and instructors were to be members of the Presbyterian Church in good standing "and under the care of the General Assembly of that church in the United States." In his instrument executed in 1871 he was earnestly desirous that the gospel of Jesus Christ may be known to all mankind and "that all may enjoy its inestimable blessings." He desired the principal of the scholarship fund to be kept inviolate and its interest applied "to the education of christian young men for the christian ministry." He expressed himself in the most emphatic terms that there should be a forfeiture of the fund "should Lane Seminary ever cease to exist, or cease to be a Protestant Evangelical Theological Seminary." In his will he provided that the funds are bequeathed on the express condition "that said Lane Seminary shall continue to be a Protestant Evangelical Theological Seminary."

No other conclusion can be reached than is expressed by these signposts of intention, viz.—

Preserved Smith desired the trusts to endure as long as Lane Seminary was a corporation; as long as it conducted a Protestant, Evangelical, Theological Seminary, and that the benefits of such trusts were for pious young men educated for the christian ministry in a seminary under the care of the General Assembly of the Presbyterian Church. These, and not the locus of the work to be carried on, were the controlling desires of the donor. The dominant purpose was a general charitable intent to assist the Presbyterian theological education of young men, the location of Lane Seminary at the time of the creation of the trusts being in the mind of the donor as the place where at such time the theological educational work was then being carried on. The absence of a provision in either the instrument of the will providing for a forfeiture or gift over, in the event such theological education was not conducted at Walnut Hills, Cincinnati, Ohio, indicates that the locus was not within the purview of donor's intentions.

### HAS LANE SEMINARY CEASED TO EXIST?

As pointed out above, it was one of the controlling desires of Preserved Smith that his benefactions should revert to his family in the event Lane Seminary ever ceased to exist. Accordingly one of the grounds alleged in the petition herein for the granting of relief to plaintiffs, is that Lane Seminary has ceased to exist. In the opinion of the court there has been no evidence to sustain this charge. On the contrary, the undisputed evidence shows that the corporate existence of "The Lane Seminary"

is intact and is being conducted by its trustees as a body corporate in Hamilton County, Ohio, and that its funds are in possession of and under the control and management of such trustees, and are being preserved as the property and trusts of "The Lane Seminary."

While it is true that the evidence shows that there has been some discussion as to a merger or consolidation with the Presbyterian Theological Seminary, Chicago, nevertheless up to the hearing of this case no steps had been taken to effect such purpose. Moreover, while there has been discussion as to the creation of "The Lane Seminary Foundation," there is also likewise no creation of the same. Whether the latter is to be the name or title of what moneys may be used for scholarships or for library purposes of students at the Chicago Seminary, or whether it is to be a corporation, trust, or some other device, has not appeared in evidence, nor have there been any steps taken in the accomplishment thereof.

And as long as there is "locus poenitentiae," the opportunity still remains for freedom as to the form of action that is to be taken.

In the opinion of this court, if there is a merger or consolidation under the provisions of §10038, GC, then such merger or consolidation will result in the extinction of the corporate entity of "The Lane Seminary," and plaintiffs in such event will be entitled to the benefits of the reverter clauses of the trusts. If, however, there is to be simply an arrangement or contract between Lane Seminary and the Chicago Seminary which will preserve and leave intact the corporate entity of Lane Seminary, then in the opinion of the court Lane Seminary will not cease to exist and there can be no reverter on account thereof. If a merger or consolidation is to be effected under the laws of Illinois, whereby the corporate entity of Lane Seminary still continues and its property and trusts remain in the hands of its trustees for their control and administration, then also Lane Seminary will not cease to exist and there can be no reverter.

In other words, this court, in the absence of proof showing that Lane Seminary has ceased to exist, will not declare the extinction of its corporate existence, simply because it is possible that in the future such result may be brought about. Courts do not declare a forfeiture upon what may be done as long as present acts do not give rise to such forfeiture. We are especially impressed with this by recent utterances of

the Supreme Court of the United States, wherein they decline to pass upon constitutional questions in the absence of sufficient evidence or findings of facts presenting such a record as fully presents the question proposed to be argued.

## HAS LANE SEMINARY CEASED TO BE A PRESBYTERIAN THEOLOGICAL SEMINARY?

Upon this question counsel for both parties have cited long lists of adjudications. Both the doctrine of "approximation" and that of "cy pres" are discussed in such cases. In the view of the court the answer to the question is one properly to be considered under the consideration of the doctrine of "approximation." That doctrine involves simply a new means or new locus for accomplishing the original object of the charity.

Such doctrine of "cy pres", on the other hand, involves the authorization of a new, but kindred effectuation of the objects of the charity.

As was concisely stated in the opinion in Lackland v Walker, 151 Mo., 210, at 248, involving the bequest for Shaw's Garden, at St. Louis, Mo.—

"It is a natural and necessary branch of the jurisdiction over charitable trusts that the means or details prescribed for their administration should be subject to be moulded to meet any exigency that may be disclosed by a change of circumstances, and to relieve the trusts from a condition which emperils or endangers the charity itself or the funds provided for its endowment and maintenance. Here, too, a court of equity will approximate as nearly as may be the wishes of the founder. But, in the very nature of things, the jurisdiction merely to vary the details or administration is more liberally exercised and indeed is perhaps more firmly established and more widely recognized than that which is usually called the 'cy pres' power of the court."

It is the opinion of this court that the conduct of the trustees of Lane Seminary in following the suggestion of the General Assembly of the Presbyterian Church in the United States of America, whereby the trusts and funds of Lane Seminary are used for the education of young men at the Chicago Seminary under an enlarged faculty and more extensive curriculum and augmented library, cannot be characterized as being a cessation of Lane Seminary as a Protestant Evangelical Theological

Seminary. Not only is such action of the trustees within the desire and intention of Preserved Smith, but the same is such as under the well established law of this state will be protected and enforced as the desire and intention of the donor.

It is not necessary to refer in support of the views of the court to adjudications in other states, nor to any of the decisions in this state, except the following cases:

In **Zanesville Canal & Mfg. Co. v The City of Zanesville**, 20 Ohio 483, a fund was given to establish "a school in the town of Zanesville for the poor children of said town." In course of time the boundaries of the city became largely extended. It was held that the gift being to a charitable use is to receive the most liberal construction. It was further held that the benefits of the fund were not limited to the children of parents residing in the locality which constituted the corporate town of Zanesville at the time of the death of donor. The conclusion of the court is stated at page 492 as follows:

"We advise that the trustees of this charity be not restricted in the selection of the 'poor children' who are to be admitted into their school, by any arbitrary lines, whether of town corporate, borough or city; but that the fund be administered according to the dictates of that enlarged philanthropy which we may suppose actuated its founder in making the bequest. In this spirit let the almoners of John McIntire's bounty select the beneficiaries indiscriminately, from Zanesville, according to the popular acceptance of the term—not Zanesville on the east of the Muskingum—not Zanesville on the west—not Zanesville as it was—not Zanesville as it is; but Zanesville as it may be found whenever the grateful duty is to be performed."

Subsequently the matter was again before the Supreme Court in **McIntire, Admr. et v City of Zanesville**, 17 Oh St, 352. It appeared in that case that the trustees were given certain specified stocks, the proceeds of which were to be used for the charity in question. The court held that if the investment of the fund in the specified stocks became impracticable, or the stocks became valueless, the trustees would be authorized and directed to invest the fund in other safe and productive forms. The court again repeated that the intention of the testator was to be carried out by not limiting the benefits of the fund to the children of the town as it existed at the time the fund was established.

In **City of Cincinnati v McMicken et, 6** C.C.R., 188, our Circuit Court had before it the McMicken bequest to the city of Cincinnati for what is now the University of Cincinnati. Under the terms of the McMicken will it was provided that the college buildings should be erected on the real estate in the city of Cincinnati on which he resided at the time of making his will. The site selected by testator was at that time a proper one, but by reason of numerous changes the neighborhood became entirely unsuited for the conduct of a university or educational institution. The removal of the University to Burnet Woods, a highly desirable and suitable place for a university was authorized as being within the desire and intention of the testator, which was to found a college of the highest character and not to restrict the location of its buildings perpetually to one spot. As was said by the court at page 194:

"The object of the testator in providing for an institution of such high character must be the **paramount** idea in the minds of the court, when called upon to give directions to the trustees, as well as in those of the trustees when they attempt to carry out the trust. 'What will **most effectually** tend to carry out his views?' must be the guiding question."

At page 196 the court quotes from the decision in the Zanesville case, **17 Oh St,** as follows:

"We must look deeper than the mere words of this donation, and through them see its spirit. We must inquire what the donor himself would **now** direct had he lived to witness the **present altered** circumstances of the case."

Said court also at said page uses the following language which is peculiarly applicable to the instant case:

"The University, **not its place,** is paramount in his thoughts. He does not make the donation **dependent** on the site, nor that the site shall **always remain the same.**"

That case argued most ably on both sides by most eminent counsel, was affirmed by the Supreme Court of Ohio.

Without reference therefore to other Ohio decisions, nor to numerous well considered decisions of other states, we conclude that the use of these trust funds in question for the education of students at the Chicago Seminary is within the desire and intent of Preserved Smith in the creation of the trusts and will be authorized on the clear doctrine of "approximation."

## HANDLING OF TRUST FUNDS

·During the trial it was suggested by plaintiff's counsel that the investments of the trust funds have not been kept as separate accounts, nor have they been earmarked as such. If it is contended that this violates either the letter or the spirit of the donations, the answer to such contention is that neither the terms of the trusts, the intentions of the benefactor, nor the law, requires either such earmarks, physical separation ·or preservation separate and apart from similar funds.

Evidence shows beyond dispute that the total assets of the general fund amount to $730,019.30, that there are scholarship funds amounting to $132,871.06, and that there are library investments amounting to $18,-788.73. That the market value of some of the investments is greater and that of others less than the amounts at which the funds are carried on the books is due simply to the condition brought about by the great economic change that has taken place since the year 1929, and in this connection it should not be overlooked that the trustees had full power as to the character of the investments, and there is no claim of any want of the exercise of proper judgment in making such investments.

While it is true that in some respects at times in the past there has not been a strict compliance with the exact letter of the terms of the trusts, nevertheless it should not be overlooked that the donor, Preserved Smith, himself was conscious of such failure to observe the strict letter of the terms relating to the trust and assented thereto, and that his son, W. W. Smith, who succeeded him as member of the board of trustees, likewise had knowledge of this and assented thereto. At the present time and within recent years, however, no such lapse of strict observance has occurred, and therefore the court is of opinion, on a survey of all the evidence in the case, that the trust funds are held inviolate within the meainng and spirit of the inter vivos agreement and the will of Preserved Smith.

We fully agree with the contention of plaintiff's attorney that these being funds as to which there is a continuous trust, by the provisions of §11236, GC, no statute of limitations can be availed of to bar rights which plaintiffs attempt to assert.

However, there is, aside from the statute of limitations, a controlling doctrine which governs courts of equity when rights are asserted growing out of facts committed in years past. This is the principal of laches which demands that rights in a court of

equity should be asserted before lapse of time has made a judicial inquiry difficult and uncertain by reason of the death of parties, the loss of papers and dockets, the death of witnesses and the intervention of equities. In such cases where delay under such circumstances exists, for the time fixed for suit by the statute of limitations in analogous actions at law, the burden is upon the parties asserting such rights to explain the delay and to show that it would be inequitable and unjust for a court of equity to refuse its aid in the enforcement of asserted rights. See Russell v Fourth National Bank, 102 Oh St, 248.

As pointed out in the case of Bridenbaugh v King, 42 Oh St, 410, at 415, the courts are not called upon, nor will they, as a matter of law, fix the limit, nor prescribe the rule which will determine the length of time that will be held to prevent the assertion of rights where there has been such laches, or there has been the "intervention of equities." This is in every case left to the conscience of the chancellor and is to be exercised by his sound discretion in view of all the facts and surrounding circumstances of the particular case tried before him. We therefore feel constrained to hold that if there has been any technical mishandling of these trusts in the past, nevertheless, in view of the present handling of the same, and all the facts and circumstances developed by the evidence in this case, it would be inequitable for the court to now declare a forfeiture of these trust funds on account of some possible mishandling of the trusts in the past.

## CONCLUSION

After full consideration of all the evidence in this case the lengthy arguments and the elaborate briefs that have been filed, the court has reached the conclusion that the equities of this case are with the defendants. Summarizing our conclusion, we hold:

1. Lane Seminary has not ceased to exist up to the present trial. If, and when it does cease to exist, plaintiffs will not be precluded from asserting their rights.

2. Lane Seminary has not ceased to be a Presbyterian Theological Seminary conducted by its board of trustees under the care of the General Assembly of the Presbyterian Church in the United States of America.

3. Terms of the inter vivos agreement with Preserved Smith and the bequests under his last will and testament are being observed and held inviolate, and the trust funds thereby established are being devoted

in accordance with the desires and intentions of the donor, and in accordance with the principles of equity applicable to said trusts.

4. Devotion of the trusts to the education of pious young men for the Presbyterian ministry in conjunction with the Presbyterian Theological Seminary in Chicago is not a violation of any of the terms or conditions of the trusts created by Preserved Smith.

5. Heirs of Preserved Smith are not entitled in equity to the forfeiture of the trust funds created by Preserved Smith in his lifetime and by his last will and testament, and are not entitled to an accounting thereof other than has been given them in the trial of instant case.

Without discussion of other matters which have been argued, and determination of which in the opinion of the court should not change the conclusions reached herein, the court is of opinion that the petition of plaintiffs should be dismissed.

A decree to that effect may accordingly be presented for entry.

## ON APPEAL

Ohio Appeals, 1st Dist, Hamilton Co

Decided Jan 27, 1936

### OPINION

PER CURIAM

This case comes into this court by way of appeal from the Common Pleas Court of Hamilton County.

By agreement of counsel, a transcript of all the evidence introduced in that court was introduced in this court, and no additional evidence was offered.

We have considered this evidence in the light of the oral arguments and the briefs submitted.

Our analysis and conclusions coincide with those found in the able opinion of Judge Mack, who presided at the trial in the Common Pleas Court. We refer to that opinion for the reasons for our finding in favor of the defendants.

A decree similar to that entered in the Common Pleas Court may be prepared for entry in this court.

ROSS, PJ, MATTHEWS and HAMILTON, JJ, concur.

## ON APPLICATION FOR REHEARING

Decided April 18, 1936

This cause came on to be heard on appeal from the Common Pleas Court of Hamilton County, Ohio, upon the pleadings, evidence, argument and briefs of counsel, and was submitted to the court and thereafter came on further for hearing upon an application of the plaintiff for a rehearing, and upon consideration thereof, the court find: that plaintiffs are entitled to an accounting of such trust funds as of the date of the commencement of the action in the Common Pleas Court, setting forth therein the status of such funds as of that date, and that plaintiffs are entitled to have such fund from said date kept separate and distinct from all other funds in the custody and control of the defendants, and the accounts thereof to be kept separate and apart from other accounts, and that said funds should not be intermingled with other funds in such custody and control and that the plaintiffs are entitled from time to time and at reasonable periods to receive statements showing the accruals to such funds and the disposition of such amounts as may be disbursed therefrom, and that as to all other matters prayed for by plaintiffs the court further finds against the plaintiffs.

It is therefore ordered, decreed and adjudged that this cause be remanded to the Common Pleas Court of Hamilton County, that such court maintain jurisdiction over the administration of such trusts, and that it require the defendants forthwith to furnish the plaintiffs an accounting of the status of such trust funds as of the date of the commencement of this action in the Common Pleas Court, and that such trust funds be kept separate, distinct and apart from all other funds in the custody and control of the defendants, and the accounts thereof be kept in like manner separate and distinct from other accounts, and that the Common Pleas Court require the defendants at reasonable periods of not more than one year to furnish accounts to the plaintiffs setting forth the accruals to such funds and any distribution therefrom, and that as to all other matters the prayer of the petition is denied; and that the defendants pay the costs of these proceedings; and that this decree is without prejudice to the rights of the plaintiffs or the heirs of Preserved Smith in the event that hereafter the provisions of the trust involved herein be not continued as therein specified.

It is further ordered that a special man-

date issue to the Common Pleas Court of Hamilton County to carry this decree into effect.

To all of which defendants except.